**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **UNITED STATES** | ) ) ) | |
| v. | ) ) | **Criminal No. 1:21-cr-206-1 (EGS)** |
| **JONATHAN MELLIS** | ) ) | |
| **Defendant.** | ) ) ) | |

### DEFENDANT'S SUMMARY OF EVIDENCE AND ARGUMENT REGARDING MOTION TO RECONSIDER  PRETRIAL DETENTION

Defendant Jonathan Mellis, by and through undersigned counsel, respectfully files this Summary of Evidence and Argument regarding his  motion to reconsider his release from pretrial detention. *See* Dkt. Nos. 27, 29, 30, 32, 34, and 35.

### INTRODUCTION

Mr. Mellis first requested a reconsideration of his pretrial detention nearly eight (8) months ago on December 31, 2021. *See* Dkt. No. 27. The Government filed an Opposition on January 7, 2022.  Dkt. No. 28. Mr. Mellis supplemented his initial Motion with several additional filings addressing his: 1) lack of dangerousness; 2) nonexistent risk of flight; 3) criminal history; 4) extensive community and familial support; as well as 5) an evidentiary analysis of the circumstances surrounding the allegations in this case; 6) information relating to Kelly Wilde, the proposed third-party custodian; 7) information relating to a proposed private security company, the Avigdor Protection Agency, who will provide additional monitoring support to the third-party custodian; and 8) detailed comparisons to other January 6 defendants who counsel argues engaged in more egregious conduct but have been released on conditions. *See* Dkt. Nos.

1

27, 29, 30, 32, 34, and 35. Mr. Mellis incorporates by reference all previous filings in this matter relating to his detention. *Id*.

As of this filing, Mr. Mellis has been incarcerated for eighteen (18) months, since February 16, 2021, with no trial date in sight. Mr. Mellis files this Summary to consolidate previous arguments outlined above, to provide some additional context, and to provide the Court with two (2) brief, video exhibits, and screenshots.[1]

## ARGUMENT

Mr. Mellis came to the District of Columbia to attend a peaceful, political rally. He traveled alone, he made no plans or arrangements beyond attending the scheduled rally at the Ellipse, and he did not bring any weapons, body armor, or other items to use in a "violent insurrection."

### I. MR. MELLIS' LACK OF DANGEROUSNESS

To support its claim that Mr. Mellis is dangerous, the Government, in several filings, makes claims that are unsupported or directly contradicted by the evidence. For instance, the Government repeatedly claims that Mr. Mellis came to Washington, D.C. "to participate in the violent insurrection against the government of the United States." Dkt. No. 28 at 2; *see also* Dkt. No. 33 at 5.[2]

---

[1] The content of these videos is not new to the Government. Exhibit 8-A was previously provided to the Government and the Court as defense Exhibit 8. Exhibit 8-A has been captioned to provide clarity as to what Mr. Mellis was yelling in order to attempt to protect Officer Fanone. Exhibit 9 shows Mr. Mellis' actions from a different angle than that in Government's Exhibit 4, which was previously provided by the Government to the defense and the Court on February 1, 2022.

[2] Similarly, the Government originally claimed that Mr. Mellis brought a large stick "to use to the U.S. Capitol [*sic*]" as a weapon. *Id*. at 4. This claim is directly belied by the Government's video evidence of the incident, which shows someone passing Mr. Mellis the stick used. The Government concedes that its claim regarding the stick is mistaken.

The Government has yet to substantiate this claim with any evidence. This assertion by the is simply untrue and is contradicted by the evidence in this case. In fact, Mr. Mellis did not come to the Capitol to commit violence or cause harm to any individual or to any constitutional process. This truth is further revealed in his response to witnessing assaults against Officer Fanone and the death of Roseanne Boyland.

### *Officer Michael Fanone*

Mr. Mellis did not intend to hurt anyone on January 6. This is not just an assertion but is proven by video evidence from events earlier that day. At one point, Officer Fanone was attempting to navigate the huge crowd of protesters at the Capitol. In the attached video,[3] Mr. Mellis, who was positioned approximately 15 feet away, can be heard and seen yelling to the crowd – "don't hurt him," "let's show him how merciful we are," "let's show him who the good guys are," and "keep him safe." In its Opposition, the Government does not explain why it considers Mr. Mellis' efforts to protect Officer Fanone to be "an affront to the heroic officers … who risked their lives to protect our democracy." Dkt. No. 28 at 10. To the contrary, such efforts are consistent with Mr. Mellis' purpose for being in the District – to show and communicate political support, rather than to commit violence.

### *Roseanne Boyland*

Officer Fanone's plight was not the most significant violence Mr. Mellis witnessed on January 6. He was directly present when another protestor, Roseanne Boyland, tragically lost her life. In fact, Mr. Mellis' actions with the wooden stick were in direct response to the trauma of witnessing her death first-hand.

---

[3] *See* Exhibit 8-A_Mellis – Fanone – with captions; *see also* Dkt. No. 27, fn. 4. This video contains captions that have been added to provide further clarity.

The Government asserts that Mr. Mellis "falsely claims" that he witnessed these tragic events and simply dismisses the trauma experienced by Mr. Mellis. *See* Dkt. 28, at 15. The Government derides Mr. Mellis' desire to protect the unknown stranger whose limp body was in front of him as "insulting" or an "affront" to the officers at the Capitol on January 6. *Id*. at 10, 14. The Government's assertions are contradicted by the video evidence.

On Officer Loaner's Body Worn Camera ("BWC") footage,[4] Ms. Boyland can be seen lying on the ground appearing to be unconscious. It is unclear if she had already died at this point.[5] On Officer Sajumon's BWC, it can be clearly seen and heard that people were being crushed and unable to move.[6] At 16:25:33, a man can be heard saying "I can't, I can't, I got people underneath me." *Id*. A few seconds later, at 16:25:44, a voice can be heard saying "get her up, get her up, please save her life." *Id*.

At 16:27:11, a distinct loud roar from the crowd can be heard. *Id*. This is extremely important because the same loud roar directly corresponds in time and can be heard in the video purporting to show Mr. Mellis using a wooden stick to defend others he believed were being trampled.[7] This directly contradicts the Government's claims that Mr. Mellis was simply acting violently for violence's sake and not responding to the plight of those being trampled. At 16:27:47, Ms. Boyland can be seen again lying on the ground, apparently unconscious, as civilians, not police, attempt to render aid.[8]

---

[4] *See* Dkt. No. 27, fn. 6 – at 16:27:09.

[5] *See id*.

[6] *See id*., fn. 8 – at 16:25:30-16:29:00.

[7] *See id*., fn. 16. – Mellis Assault on USCP Officer.mp4

[8] *See* Dkt. No. 27, fn. 8 – at 16:27:47.

Officer Huff's BWC[9] shows a civilian attempting to perform CPR on Ms. Boyland, and then her lifeless body being dragged by police. *Id*. Officer Chen's BWC[10] shows civilians pleading for help from the officers, asking for a "medic;" the police ignore the pleas.[11] On Officer Morris' BWC,[12] Ms. Boyland's body can be seen lying unconscious as she is stepped on, and civilians attempt to retrieve her body and provide medical assistance. *Id*. Voices can be heard screaming "she's dead, she's dead." *Id*.

To further corroborate Mr. Mellis' account that citizens were trampled, injured, and needing medical assistance, ███████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███

It is exactly 4:27 p.m. when Mr. Mellis comes into the picture – having just witnessed the trampling and death of Ms. Boyland.[13] Mr. Mellis is handed a stick which he did not bring

---

[9] *See id*., fn. 9 – at 16:30:53

[10] *See id.*, fn. 12 – 16:29-16:30.

[11] *See id.*, fn. 12 – at 16:26-16:30.

[12] *See id*., fn. 15 - at 16:27:50.

[13] *See id*., fn. 15 - at 16:27:06.

5

himself and for a matter of seconds uses it to defend others from what he perceived to be an imminent threat.[14]

Another video, with screen shot below, showing Mr. Mellis' actions from a different angle, shows the small number of attempted strikes and that he was toppled over into the crowd almost immediately. *See* Exhibit 9, at 2:18.



The risk and danger to Ms. Boyland and others at this location is apparent in the harrowing footage from the scene. Included below is an annotated screen shot image from the referenced body camera showing the Mr. Mellis' proximity to Ms. Boyland, which directly contradicts the Government's assertion that he did not witness the tragic event of her death.

---

[14] *See* supra fn. 5.



## II.     MR. MELLIS IS NOT A FLIGHT RISK

The Government's claim that Mr. Mellis is a flight risk is without merit. Essentially, the Government argues that because Mr. Mellis could face a potential sentence of several years of incarceration if convicted, he is *ipso facto* a flight risk. *See* Dkt. No. 28, at 13. This claim is belied by Mr. Mellis' extensive ties to Virginia. Moreover, the Government ignores the fact that his partner, Kelly Wilde, has already been screened and approved as a third-party custodian. The Court is equipped with extensive tools for supervision, and any concerns the Court may have about Mr. Mellis' risk of flight can be more than adequately addressed through strict conditions of release and close supervision. There is no evidence, and the Government does not point to any evidence of any history by Mr. Mellis of avoiding Court or failing to appear, even when he previously faced a multi-year period of incarceration.

### III. MR. MELLIS' CRIMINAL HISTORY

Mr. Mellis does have prior criminal convictions, the most serious of which was a conviction for conspiring to manufacture/sell a controlled substance in Williamsburg and James City County, Virginia. However, that conviction did not involve a weapon and was otherwise non-violent. He does have several misdemeanor convictions for assault and other petit offenses, but all occurred 13-15 years ago, during a time in which Mr. Mellis was engaged in substance abuse, which no longer occurs. Mr. Mellis matured greatly while in prison, and has not been convicted of any offense since his release from prison in 2017. Mr. Mellis was successfully terminated early from probation on March 12, 2019.[15]

### IV. MR. MELLIS' COMMUNITY AND FAMILIAL SUPPORT

Mr. Mellis is thirty-four (34) years old and was employed in the food service industry in Nashville, Tennessee before his arrest. He also volunteered a great deal of time at a senior citizens center in Lebanon, Tennessee and with other non-profit organizations. Mr. Mellis spent the better part of 2020 in Williamsburg, Virginia where his family lives, and in Memphis, Tennessee, where he was staying with his girlfriend, Kelly Wilde.

Mr. Mellis provided numerous letters of support from family, friends, and a retired Sheriff from Williamsburg-James City County, Virginia, all of whom attest to the peaceful nature of Mr. Mellis.[16]

---

[15] See Pre-plea Criminal History and Guidelines Calculation, Dkt. No. 21 at p. 7.

[16] Counsel has provided the contact information to the Government for Mr. Barnes of the Avigdor Protection Agency, Kelly Wilde, as well as several others who provided letters of support, so that the Government can interview and otherwise perform any due diligence it sees fit. It is counsel's understanding that Mr. Barnes has already been interviewed by the FBI.

## V. MR. MELLIS' WELL-DEVELOPED RELEASE PLAN

### *Third-Party Custodian*

If released, Mr. Mellis will live in Tennessee with his girlfriend, Kelly Wilde. Ms. Wilde was contacted and screened by Pretrial Services, who has approved her as a third-party custodian for Mr. Mellis on two occasions. *See* Dkt. No. 29, at 4.  As described below, Mr. Mellis has arranged additional support for Ms. Wilde to provide the Court with even more reassurance as to the strict adherence to the rules of supervision should the Court release him.

The Government objects to Ms. Wilde serving as a third-party custodian. Dkt. No. 33 at 4.  In opposing Ms. Wilde, the Government baselessly asserts that Mr. Mellis traveled to the District on January 6 to disrupt Congress and that somehow Ms. Wilde "must have been aware of this fact." *Id*. The Government speculates that, because she is in a romantic relationship with Mr. Mellis, Ms. Wilde "must have been aware *if not supportive* (emphasis added)" of Mr. Mellis' "assaults on law enforcement officers." *Id*. The Government provides no support for these claims, they are without merit, and should not be considered by this Court.

### *Avigdor Protection Agency*

Mr. Mellis has also made arrangements with the Avigdor Protection Agency, LLC ("Avigdor") to provide daily in-person monitoring if the Court were to release him and allow him to live at Kelly Wilde's address in Nashville, TN.  Avigdor was co-founded by Sam Barnes, a retired law enforcement officer who has twenty-six (26) years of experience as a Deputy Sheriff, police office, and investigator in Tennessee.  Avigdor has been contracted to conduct in-person visits of Mr. Mellis by its personnel, which consists of off-duty Tennessee State Troopers, police officers, and other security personnel.  Avigdor personnel are required by contract and

could of course be ordered by the Court to immediately report any violations of release conditions by Mr. Mellis to Pretrial Services and/or the Court.

Mr. Barnes will be available to answer any questions the Court or government may have about this proposal, which counsel submits should assuage any safety concern the Court might have in releasing Mr. Mellis.

### *United States v. Klein*

The Government relies upon United States v. Klein[17] in its argument against Mr. Mellis' release. In fact, Judge Moss's decision in *Klein supports* Mr. Mellis' contention that he should be released with Ms. Wilde as a third-party custodian.

In originally denying Mr. Klein's release, Judge Moss cited the "lack of a well-developed proposal" for his release. *Id.* at 15. However, the Court also indicated that "appropriate conditions on Klein's release might provide sufficient assurances of community safety. These include, by way of example, (1) appointment of a suitable third-party custodian; (2) home detention; (3) GPS monitoring; (4) appropriate social media restrictions; and (5) an enforceable ban on access to any firearm or other weapon." *Id.* at 13. Mr. Klein could "renew his motion for pretrial release if he has a good-faith basis for doing so, which includes an identification of (1) appropriate conditions of his release; (2) a suitable place to live; and (3) a suitable third-party custodian that Pretrial Services vetted." *Id.* at 15. Mr. Klein was subsequently released after providing the Court with a well-developed release plan.

Mr. Mellis meets the conditions outlined above, as he has also provided this Court with a thorough, well-developed release plan. Ms. Wilde has been screened and approved by Pretrial Services. She has been present at multiple hearings and is available to testify to the Court if

---

[17] 1:21-cr-237 (RDM), Dkt. Nos. 28, 37.

.

needed. In addition, Mr. Mellis proposed and would abide by additional conditions of release just as those suggested *Klein*, including GPS monitoring, home detention monitored by both Pretrial Services and a privately retained security firm, and firearm or social media restrictions. Mr. Mellis agrees with the Government that this Court should apply Judge Moss's reasoning, and consequently order Mr. Mellis' release.

## CONCLUSION

Mr. Mellis' conduct on January 6, his background, and his proposed conditions of release show that he is neither a flight risk nor a danger to the community. His discrete, isolated acts were in direct and immediate response to the ongoing harm that another person was suffering. Just as he attempted to do with Officer Fanone, Mr. Mellis sought to mitigate and neutralize the violent behavior that he witnessed. At the very least, for purposes of this request to reconsider his detention, any concern about Mr. Mellis' dangerousness can be cabined within the unique events of January 6, 2021. In the ensuing four (4) months between that day and his arrest, Mr. Mellis was not a danger to the public. The Court has ample tools and resources to address any risk Mr. Mellis could pose through conditions of release and supervision.

There is a screened and approved third-party custodian, Kelly Wilde, who is ready to assist in those supervisory efforts and ensure Mr. Mellis is accountable to the Court. Ms. Wilde is part of a strong support system that Mr. Mellis enjoys in the community. In addition, her supervision can be supplemented and backstopped by a professional security company.

WHEREFORE, Jonathan Mellis respectfully requests that the Court release under conditions that it deems appropriate.

Respectfully submitted,

____/s/_____
David Benowitz
D.C. Bar No. 451557
Price Benowitz LLP
409 Seventh Street, NW
Suite 200
Washington, DC 20004
david@pricebenowitz.com
*Counsel for Jonathan Mellis*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 11th day of September, 2022, a copy of this pleading was served on all parties via the CM/ECF system.

____/s/_____
David Benowitz