**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-CR-206 (RDM)** |
| **JONATHAN MELLIS,** | |
| **Defendant.** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Jonathan Mellis to 60 months' incarceration, three years of supervised release, $2,000 in restitution, a fine of $88,464, and the mandatory $100 special assessment.

**I.      INTRODUCTION**

Mellis violently participated in the January 6, 2021 attack on the United States Capitol— an attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than two million dollars' worth of property damage. Mellis willfully and deliberately used an approximately four foot long, three-inch thick stick to repeatedly strike police officers in the face, head, neck, and torso.

The government recommends that the Court sentence Mellis to 60 months' incarceration, which is at the high end of the advisory Guidelines' range of 51-63 months, which the government submits is the correct Guidelines calculation. A 60-month sentence would reflect the gravity of Mellis' actions: he joined a violent mob at the U.S. Capitol, perpetrated an exceptionally violent

1

attack by repeatedly beating besieged officers with a large wooden pole, and, despite his flagrantly

illegal, dangerous, and harmful actions, has shown no remorse.

## II.    FACTUAL BACKGROUND

The government refers the Court to the PSR's summary of background facts regarding the

January 6, 2021 attack at the U.S. Capitol. PSR ¶¶ 14-25. The area that perhaps saw the greatest

violence that day was the Lower West Terrace ("LWT") tunnel, the site of Mellis' attack. As

Metropolitan Police Department (MPD) Officer Michael Fanone described:

> The fighting in the lower West Terrace tunnel was nothing short of brutal. Here, I
> observed approximately 30 police officers standing shoulder to shoulder, maybe
> four or five abreast, using the weight of their bodies to hold back the onslaught of
> violent attackers. Many of these officers were injured, bleeding, and fatigued, but
> they continued to hold the line.

*Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer*

*Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the

United States Capitol, 117   Cong. (July 27, 2021) (Statement of Officer Michael Fanone),

*available at* https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack

At approximately 2:42 p.m., the mob broke the windows on a first set of swinging doors

inside the tunnel.   The mob swelled and the rioters pushed their way into a second set of doors,

attacking law enforcement with batons, poles, bottles, police shields and other items. For over two

hours, the violence continued as police battled to keep control of the tunnel and prevent hundreds

of rioters from entering the building. The tunnel was the sight of some of the most vicious attacks

on law enforcement that day. This included hand-to-hand combat, pepper spraying, crushing

several officers against the doors, and the abduction and tasering of MPD Officer Michael Fanone,

during an incident in which Fanone was dragged from the police line into the crowd tased in the

back of the neck, and assaulted. Officer Fanone suffered severe injuries as a result of the assault, including scarring, heart damage, and a concussion.

Capitol Police Sgt. Aquilino Gonell, who was present in the tunnel that day, described the scene:

> What we were subjected to that day was like something from a medieval battle. We fought hand-to-hand, inch-by-inch to prevent an invasion of the Capitol by a violent mob intent on subverting our democratic process. My fellow officers and I were committed to not letting any rioters breach the Capitol. It was a prolonged and desperate struggle.

*Id.* (Statement of Sgt. Aquilino Gonell).

Many officers sustained injuries during this prolonged struggle but continued to fight to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until Virginia State Police officers joined the police line around 5 p.m. Despite being under constant assault, these officers nevertheless provided first aid to injured rioters who were trapped in the tunnel area, including those who had difficulty breathing as a result of chemical irritants that had been used in the tunnel area. It is not an exaggeration to state the actions of these officers in thwarting the mob at the LWT entrance potentially saved the lives of others, including potential harm to members of Congress, some of whom were sheltering nearby.

### A.    Mellis' Participation in the January 6, 2021 Attack on the Capitol

Mellis traveled to Washington, D.C. on January 6, 2021 to attend the "Stop the Steal" rally, which was organized to protest the result of the presidential election. As the rally was finishing, Mellis joined a large crowd that marched to the Capitol, where the Joint Session of Congress to certify the Electoral College vote was underway.

Upon arriving at the Capitol, Mellis unlawfully entered Capitol Grounds. As he moved

towards the western front of the Capitol, he recorded and posted multiple videos on Instagram. In one video, he filmed himself amidst the crowd, framed the West Terrace of the Capitol behind him and stated, "We're getting up, we're going up, we are going up, baby!" (Exhibit 1) Later, as he made his way onto the LWT, he posted more Instagram videos in which he stated, "We ain't f**king leaving either! We ain't f**king leaving!" and "So you ever wonder where they do the inaugurations? I beat Joe Biden here. That mother****** will never come up here. We're banging on the goddamn doors, is what we're doing. Storming the f**king castle." (Exhibit 2)

### 1. Mellis' Violent Attack on Officers at the LWT

By 3:19 p.m. (the time of the attack on Officer Fanone) Mellis had arrived at the LWT and joined hundreds of rioters, some of whom were throwing and swinging various objects at the group of law enforcement officers positioned at the archway framing the tunnel.

The image below is a selfie taken by Mellis, clearly identifiable by his cowboy hat, near the entrance to the tunnel.



**Exhibit 3**

At approximately 4:24 p.m., Mellis approached the archway with the intention of

4

breaching the tunnel at the LWT and entering the Capitol. Moving from the back of the mob, he moved through the sea of people to the front. At approximately 4:26 p.m., Mellis had reached the front of the crowd. Rioters had just been pushed out of the tunnel by police officers; many were still facing away from the archway and the officers. *See,* Exhibit 4 at 0:00-0:35 At the same time, another rioter named Justin Jersey moved towards the front of the crowd carrying a large, gnarled wood stick. The stick was approximately four feet long and was several inches thick. Mellis approached Jersey and told him to "knock their masks off." (Exhibit 4). Jersey handed the large, gnarled stick to Mellis, and then, responding to Mellis' urging, charged the officers and knocked one officer ("Officer A.W.") to the ground.



**Exhibit 4A:** *Mellis (in cowboy hat) takes the long, gnarled stick from Justin Jersey.*

Before Jersey's attack, that Mellis had encouraged, there was a lull in the violence, not actively attacking the officers. But Justin Jersey's act, performed at Mellis' urging, incited the mob all over again, with rioters audibly reacting and surging forward, throwing objects as the officers and striking them with makeshift weapons. Mellis himself moved forward until he was in striking range of the officers at the mouth of the tunnel. Then, he attacked. As Jersey lunged at the officers, shoving the officers and attempting to knock their protective face and head coverings off, Mellis

wielded the stick like a sword and stabbed at the faces and heads of officers at least five times, violently striking Officers D.P. and L.M., in the face, head, neck, and body area.



**Exhibit 4B:** *MELLIS, with stick, seconds before striking officers.*



**Exhibit 4C:** *MELLIS, with cowboy hat, wields a long, gnarled stick to stab at officers.*



**Exhibit 5:** *Mellis (in Cowboy Hat) stabs at officers' faces.*

Mellis then threw the long, gnarled stick at the officers in the tunnel, before falling backwards in the chaos (*See,* Exhibit 6), but he did not immediately retreat from the LWT and the Capitol grounds afterwards.



**Exhibit 6A:** *MELLIS (circled in red) falls back from the violence he helped (re-)initiate after assaulting police officers. At 0:11 in video*

## 2. Secondary Assault at the LWT

Mellis remained at the LWT after the 4:27 p.m. assault on law enforcement. CCTV footage shows Mellis remaining just outside the LWT archway for nearly 15 minutes. By 4:40, Mellis had returned to the front of the crowd facing the police officers in the LWT tunnel.



**Exhibit 7A:** *MELLIS (circled in red) approaches archway of LWT at approximately 4:35 p.m.*

8



**Exhibit 7B:** *MELLIS (circled in red) at front of crowd at LWT at approximately 4:40 p.m.*

The CCTV shows that in the seconds following a blast of chemical spray from the crowd at 4:41 p.m., Mellis (wearing his distinctive cowboy hat) stepped back from the line and looked down around his person. Then he stepped towards the front line of police officers in the LWT and throws a three-foot piece of plywood over the police shields and at the officers. *See,* Exhibit 7 at 11:50-12:15. This is not the same stick from the 4:27 p.m. attack. The plywood ricochets off of the officers' shields and hits the tunnel ceiling with enough force that the plywood cracks in two before falling down on the officers in the tunnel.



**Exhibit 7C:** *MELLIS (circled in red) hurling plywood at officers in the LWT tunnel at approximately 4:41 p.m. MELLIS' distinctive white cowboy hat is indicated by the white arrow.*

### 3. Officers' Injuries

Amidst the chaos that Mellis had (re-)instigated at 4: 27 p.m., Officer A.W. lay supine on the ground.   His helmet was knocked off, his baton was stolen, and he was further assaulted by other members of the mob, before he was dragged down a set of steps and into the crowd of rioters. There, Officer A.W. was kicked, struck with poles, maced, and stomped on by several individuals. A With the assistance of another individual, Officer A.W. made it back to the tunnel and was ultimately taken to the hospital, where he was treated for a laceration on his head which required two staples to close.   He also sustained a concussion and bruising on multiple areas of his body, including contusions on his elbow. Due to his injuries, Officer A.W. was off duty until May 2021.

At that time, he returned to limited duty, but did not return to full duty until approximately July 2021.

Officers D.P. and L.M. sustained bruises on their heads and necks where Mellis and other rioters had struck them.

### 4.   Mellis' Conduct on January 6, 2021 After the Riot

In the evening hours of January 6, after he left the Capitol grounds, Mellis proudly proclaimed in a video "interview" with ParlerVideos that the violence he and his fellow rioters perpetrated that day on the police officers guarding the Capitol was justified. See Exhibit 8 below. His statements included:

- "Well, we grouped up on the inaugural podium, and then, uh, the cops were shooting pepper spray, tear gas, flash bangs, cattle prods hitting us with crazy sh-- and we forced our way into the hallway, they broke the window out right next to the hallway and we were climbing in there."

- "Everybody, everybody, everybody on the podium, I'm telling you, look, don't even bullsh--, ANTIFA might have been in there, and doing a little thing, I don't give a sh--, it was Trumpers, we were there and we were there to be heard. For sure. They will ignore us any other time. They will make excuses for the riots and the violence that BLM and ANTIFA do and ANTIFA and BLM get everything they want every single time they throw a hissy fit and burn innocent buildings. We had a goal, to occupy that f--king Capitol Building, . . ."



**Exhibit 8**: *MELLIS conducts interview on January 6, 2021 discussing his actions at the Capitol earlier in the day.*

Later, proud of his violent conduct, he posted three messages to Facebook that read, "Don't you dare try to tell me that people are blaming this on antifa and BLM. We proudly take responsibility for storming the Castle. Antifa and BLM or too p***y. [sic]They just burn your business down. We are fighting for election integrity. They heard us." Screenshots from that video are below. *See* Exhibits 9 and 10.



**Exhibit 9**



**Exhibit 10**

**5.  Charging and Plea Agreement**

On February 11, 2021, Mellis was arrested and charged by complaint with committing violations of 18 U.S.C. §§ 111(a)(1) and (b), 231(a)(3), 1512(c)(2), and misdemeanor offenses. He was ordered detained pending trial. On March 10, 2021, the grand jury returned a ten-count indictment against Mellis, which was followed by a superseding indictment in November 2021. See PSR ¶ 1-9. The November 2021 superseding indictment included charges of 18 U.S.C. §§ 111(a)(1) and (b), 18 U.S.C. § 231(a)(3), 18 U.S.C. § 1512(c)(2), 18 U.S.C. § 1752(a)(1) and (b)(1)(A), 18 U.S.C. § 1752(a)(2) and (B)(1)(A), 18 U.S.C. § 1752(a)(4) and (b)(1)(A), and three

14

misdemeanors.

On June 12, 2023, Mellis pled guilty, pursuant to a plea agreement, to a Superseding Information charging a violation of 18 U.S.C. § 111(a) and (b), assaulting police officers with a deadly weapon.

### 5.      Public Statements

While in custody, Mellis has maintained a high-profile media presence, appearing in a variety of media and platforms. He sought opportunities to speak to podcasters, call into rallies, and to made repeated requests that the public help him raise funds. Mellis's public statements have almost uniformly sought to excuse and minimize his conduct, relying on factually incorrect assertions and portraying himself as a victim of political persecution.

His GiveSendGo page, "Justice for J6 Jonny," (https://www.givesendgo.com/j6jonny) reflects that he has raised over $88,000 as of the writing of this memorandum. Mellis' GiveSendGo contains a video message that denounces the alleged unfairness of his detention and prosecution and he accuses "corrupt prosecutors" of lying, smearing his reputation, and manipulating video evidence. He makes inaccurate claims about how he helped protect an officer who was being dragged into the crowd and states that the only people who died on January 6 were Trump supporters. Additionally, he states that, "[He] went to protest" on January 6 against "bigotry, corruption, and transparency." Ultimately, he states, "We are the good guys."

The message has not changed since he pled guilty in June, the top of the page states, "JON HAS RETAINED PROPER COUNSEL. NOW LET'S TAKE THIS TO TRIAL FOR THE DELIVERY OF JUSTICE! Your donations will be put toward getting through trial."   The page – with these claims – remains active, and individuals continue to contribute funds. There has been

no change in these statements or renunciation of his untrue claims that he was peaceful and is a victim, despite his guilty plea to assault.

His GiveSendGo account is but one example. Mellis's public statements depict him, not the officers he brutally attacked, as the true victim. The below screenshot is an example of a tweet in which he advances this narrative:[1]



**Exhibit 11**

Further examples of Mellis' media presence are listed below. This is not an exhaustive list by any means, rather, a sampling of the prolific public relations campaign Mellis has been able to

---

[1] Of note, the video and social media post in Figure __ were – by Mellis' own admission –"recorded from a jail-issued laptop for viewing discovery." This is not the purpose of discovery laptops, and Mellis' usage of the laptops to maintain his social media presence denies other prisoners the ability to review discovery for their own cases.

conduct from jail, highlighting his lack of remorse for his assault on law enforcement and his propagation of misinformation relating to the events of January 6, 2021:

- Mellis tweeted a video that he claimed showed him protecting Officer Fanone after he was pulled into the crowd. In the video, Mellis is filming Officer Fanone in the crowd and yells, "Don't hurt him. Hold him. Let's show him how merciful we are. Let's show him who the good guys are! We are the good guys!" Mellis then puts his face into the frame, with Officer Fanone behind him, and yells, "We are the good guys!" as Officer Fanone continues to be attacked by the crowd. *See* Figure 1[2] (https://twitter.com/wearegoodmenj6/status/1631708779401052189)



**Figure 1**

- Mellis called into a #sing4freedom event hosted by Gen. Michael Flynn and "DC Gulag"

---

[2]  As explained further below, Mellis did not appreciably help Officer Fanone.

to support the "political hostages" trapped in jail (tps://rumble.com/v1zytsu-sing4freedom-with-the-dc-gulag-political-hostages-and-gen.-flynn.html)

- On the second anniversary of the Capitol Riot, Mellis called into a rally supporting January 6th defendants and spoke to the crowd, impersonating a morning DJ. "Good evening, DC Gulag!" he said. "Welcome to the second annual January 6 curfew breakers extravaganza!" In the call, he maintained that the January 6th defendants were being unfairly maligned and prosecuted. (https://twitter.com/FordFischer/status/1611580450253799425)

- In March 2023, Mellis gave interviews to *The Gateway Pundit* (https://www.thegatewaypundit.com/2023/11/j6-political-prisoner-jon-mellis-watches-another-birthday/) and Red Voice Media's *Alicia Powe Show* (https://rumble.com/v2fcx4q-j6-political-hostage-pleads-with-congressmen-who-visited-dc-jail-to-probe-r.html) and described how he "pled" with twelve members of Congress visiting his Washington, D.C. detention facility. He stated that he was one of "over a dozen men who are facing many, many, many years in prison because we tried to help Roseanne Boyland."[3] He stated, "I had one very clear and very precise message and that is, justice for Roseanne Boyland and the other three people who died on January 6." He profoundly mischaracterizes the video evidence around the death of Roseanne Boyland by stating, "the footage is so clear we were trying to help her." He omitted any mention of his assault on police.

- Mellis established and sponsored "WE ARE GOOD MEN" a website dedicated to

---

[3] Boyland was a rioter who died on January 6 because of acute amphetamine intoxication. As explained below, Mellis' claims that he was protecting her are false.

fundraising for Capitol rioters facing trial and spreading misinformation about the events of January 6, 2021. (https://www.wearegoodmen.com/news) *See* Figure 2. The site alternatively lists Mellis by name and as a "Patriot in the DC Gulag" as its sponsor. Notably, the site contains extensive misinformation regarding Roseanne Boyland's death, denying that there were assaults on police and accusing law enforcement of "murdering" her. (https://www.wearegoodmen.com/). "Kelly", who is Mellis' girlfriend and has given interviews supporting Mellis' innocence, is listed as the website point of contact. The site is still active as of December 11, 2023.



**Figure 2**

Among the most frequent and egregious statements made by Mellis in his posts and interviews were the claims that he helped Officer Fanone when the mob abducted him, and that his actions on January 6th were intended to protect rioters who were being trampled by the police. These assertions are clearly untrue.

First, when Officer Fanone was abducted by the crowd, Mellis did not seek to help him. A video filmed by Mellis (referenced in a bullet above) clearly shows Mellis being some distance

away from Officer Fanone. Amidst the noise and turmoil of the crowd, it is unlikely that anyone actually attacking Officer Fanone could hear Mellis. Rather than helping Office Fanone or encouraging his fellow rioters to allow Officer Fanone to return to the police line, Mellis chose to take a selfie video of himself yelling, "We are the good guys!" There is no record of Mellis taking any affirmative steps or actions to help Officer Fanone. Instead, Mellis' main objective appeared to be curating content for his social media accounts.  The idea that someone who once uttered "Don't hurt him" and yet beat officers with a stick should be remembered as someone who was there to help officers is nonsensical.

Mellis' oft-repeated claim that his conduct at the LWT was aimed at helping Roseanne Boyland, a rioter who died during the siege, is also both inaccurate and insincere. The timeline of events and video footage do not support his narrative. At approximately 4:18 p.m., Boyland pushed through the archway from the LWT of the U.S. Capitol and entered the tunnel. By 4:26 p.m., she was no longer conscious, and her body could be seen on the ground near the north side of the archway. The image below shows a person in blue kneeling over Boyland at the same moment Mellis is taking the gnarled stick from a fellow rioter.  As the individual in blue yells "I need somebody!   I need help!" Mellis can be heard on video encouraging Jersey to attack the police line and "knock their masks off" to make the officers more exposed to Mellis' assault with the stick.

Mellis did not come to Boyland's assistance. Rather, he lunged over her motionless body in his excitement to attack police officers. She was still lying on the ground when he left the entrance to the tunnel. At approximately 4:28 p.m., individuals in the crowd – not including Mellis -- dragged Boyland's body away from the archway and into the crowd, whether they attempted to

provide aid. At approximately 4:30 p.m., several individuals -- again, not including Mellis -- carried Boyland's body to the police line in the archway. Officers brought Boyland into the passageway and performed CPR but were unable to revive her. *See,* Exhibit 4D.



**Exhibit 4D:** *Mellis (in white cowboy hat) takes gnarled stick from another rioter. The rioter in blue, identified with a yellow arrow, is kneeling to aid Roseanne Boyland in front of Mellis. At :35-:50, Mellis can be heard encouraging Jersey to "knock their masks off."*

Later, the Office of the Chief Medical Examiner for the District of Columbia determined that Boyland's cause of death was acute amphetamine intoxication, not any physical contact with an officer.

## III.   STATUTORY PENALTIES

As noted by the plea agreement and the U.S. Probation Office, a violation of 18 U.S.C. § 111(b) carries a maximum sentence of 20 years of imprisonment; a fine of $250,000 or twice the pecuniary gain or loss of the offense, pursuant to 18 U.S.C. § 3571(b)(3); a term of supervised release of not more than 3 years, pursuant to 18 U.S.C. § 3583(b)(2); and an obligation to pay any applicable interest or penalties on fines and restitution not timely made.

21

## IV.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.*

The Probation Office, the government, and defense counsel all agree to the following Guidelines analysis:

Count One: 18 U.S.C. § 111(a)(1)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14[4] |
| U.S.S.G. § 2A2.2(b)(2)(B) | Use of a Dangerous Weapon | +4 |
| U.S.S.G. §2A2.2(b)(7) | Conviction under §111(b) | +2 |
| U.S.S.G. § 3A1.2(a) and (b) | Official Victim | +6 |
| | **Total** | **26** |
| Acceptance of Responsibility Under U.S.S.G. § 3E1.1(a) and (b) | | -3 |
| **Total Adjusted Offense Level:** | | **23** |

*See* Plea Agreement at ¶¶ 5(A).

Because all but one of his nine prior adult criminal convictions (including four convictions for assault), PSR ¶¶ 48-56, were too old to generate criminal history points, the U.S. Probation Office calculated Mellis' criminal history as category II with three criminal history points, PSR ¶ 57, which the government does not dispute. PSR ¶¶ 100-102. Accordingly, based on the

---

[4] The starting point for a violation of 18 U.S.C. § 111 is U.S.S.G. § 2A2.4.  Because the conduct constituted aggravated assault, the cross-reference in U.S.S.G. § 2A2.4(c)(1) requires the application of U.S.S.G. § 2A2.2.

government's calculation of Mellis' total adjusted offense level, after acceptance of responsibility, at level 23, Mellis' Guidelines range is 51 to 63 months' imprisonment. PSR ¶ 99.

## V.      SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

Sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, all the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.      Nature and Circumstances of the Offense

Mellis' violent and deliberate participation in the mob's efforts to break into the U.S. Capitol Building by assaulting police officers weighs heavily in favor of significant sentence of incarceration.   Mellis chose to unlawfully enter the U.S. Capitol Grounds on January 6, 2021, for the stated purpose of preventing Congress from completing its constitutional duty of certifying the results of a lawful election. He joined the most violent battle taking place there, staying in the area for at least an hour.

Mellis was a key instigator in reigniting the violence on the LWT. Minutes before Mellis' assault, the police had pushed rioters outside of the tunnel. Mellis reignited the violence by encouraging Justin Jersey to attack officers and to "knock their masks off." That is what Jersey immediately did, knocking Officer A.W. to the ground, where he was unable to defend himself, as Jersey attacked even more brutally. Mellis then used the large stick he took from Jersey to viciously

23

attack officers. As shown on the video, Mellis stabbed at the police officers' heads and shoulders with a large, gnarled stick at least five times before throwing the stick at them.

After Jersey and Mellis attacked, others followed their lead and the battle resumed. Mellis' willing and repeated participation in violence against police officers protecting a lawful proceeding of Congress and the peaceful transfer of power weighs heavily in favor of a significant period of incarceration. His offense reflects a disturbing willingness to incite and engage in violence and endanger officers.

### B.   Mellis' History and Characteristics

Mellis' criminal history category of II, if anything, understates his record. His criminal history includes a felony drug-trafficking conviction in Virginia for which Mellis was sentenced to 20 years' incarceration (with ten years suspended). PSR ¶ 52. While his most recent conviction took place in 2008 at age 21, PSR ¶ 56, he was incarcerated between 2009 and 2017, and he has been arrested on seven other occasions which did not result in a conviction, including for assault, PSR ¶ 59, and domestic assault in 2019, PSR ¶ 65. Although the government is not seeking an upward departure for underrepresented criminal history pursuant to U.S.S.G. § 4A1.3, his substantial "uncounted" convictions, including those for, like the instant offense, assaultive conduct, support the government's recommendation in this case.   He is not a first-time offender deserving of leniency.

The Court should consider that Mellis remains unrepentant his vicious assaults against police on January 6.   Moreover, he has used his time in custody to wage a media campaign spreading false information about "political persecution" that conveniently ignores the brutal assaults that he and many of his fellow detainees committed on January 6.   He has also spread

false claims that he helped a police officer and acted only to save a dying woman, further evidence of his remorseless, and has continued to raise money off these types of claims even after pleading guilty, further demonstrating remorseless, opportunism, and a hunger for publicity, money, or both that he is willing to allow to eclipse the truth. The January 6 riot exemplifies the harm caused by false political claims run amok; Mellis has only poured salt in the wound.  His history and characteristics justify a sentence at the top of the range here.

### C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[5] As with the nature and circumstances of the offense, this factor supports an extensive sentence of incarceration. The rule of law was not only disrespected; it was under attack that day. A sentence lower than the Guidelines range would suggest to the public, in general, and other rioters, specifically, that attempts to obstruct official proceedings and assaults on police officers are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### D.     The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime

---

[5] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).   Both weigh strongly in favor of a lengthy sentence here.

### General Deterrence

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[6] There is possibly no greater factor that this Court must consider.

### Specific Deterrence

Mellis needs specific deterrence. This is not his first criminal conviction – in fact, he has many convictions and a lengthy incarceration. Second, Mellis committed violent assaults on MPD officers and he observed -- close up – while other rioters committed violence and assaultive offenses against law enforcement officers in their effort to seize the U.S. Capitol Building. Mellis could have left when he saw the assault on Officer Fanone at approximately 3:19 p.m. but instead he chose to take a selfie video and stayed to commit a violent assault. His actions suggest a callousness and even glee at the violence taking place around him.   And Mellis' total lack of remorse and public statements to the contrary create still further need for specific deterrence; it appears that he may believe that the use violence is an acceptable path to achieve political ends. Someone who does not understand why his brutal attack was wrong may commit violence again.

As the United States approaches another presidential election, the Court should consider how its actions can seek to prevent another tragic assault on the rule of law, our national

---

[6] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

institutions, and law enforcement.

### E.     The Importance of the Guidelines

The 3553(a) factors include the guidelines range. 18 U.S.C. § 3553(a)(4)(A). "The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). "[T]he Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough v. United States*, 552 U.S. 85, 89 (2007). As this Court knows, the government has charged over 1000 people with crimes based on the January 6 riot. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a driver of consistency and fairness.

### F.     Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that Mellis and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other assaultive or obstructive related conduct in other cases. To mechanically compare defendants who violated § 111(b) before January 6, 2021 would fail to take into consideration the context in Mellis' crimes occurred and would be a disservice to the magnitude of what the riot entailed and signified.

Many other Capitol Riot defendants have been sentenced for convictions under 18 U.S.C. § 111(a)(1) and (b). Similarly, to Mellis, some of those defendants also attacked officers with metal poles and other dangerous weapons, the government avers that Mellis was one that was physically

more violent and potentially more harmful to the officers. Unlike Mellis, many of those who attacked officers on January 6 had no criminal history, an important distinction.

In *United States v. Lucas Denny*, 22-cr-70 (RDM), the defendant was a military veteran and former law enforcement officer. He brought protective gear and weapons to Washington, D.C. He spent a lengthy period of time on the Capitol grounds, taunting and assaulting officers He deployed chemical spray against police officers and used objects to strike them. He undertook a significant level of planning and preparation for January 6, 2021, including fundraising, recruiting others to take up arms with him, and procuring weapons and protective gear for himself and others. And he engaged in repeated instances of assaultive conduct, in several locations on the Capitol grounds, over the course of more than an hour and a half. Denney entered the LWT tunnel and pushed a riot shield into and on top of the line of police officers positioned there. Upon exiting the tunnel, Denny swung his arm and fist at police officer who had been dragged into the mob of rioters. Like Mellis, Denny pleaded guilty to violating 18 U.S.C. § 111(a) and (b). Unlike Mellis, Denny had a completely clean criminal record. This Court sentenced Denny to 52 months' incarceration.

In *United States v. Donald Hazard*, 22-cr-117 (RDM) the defendant, with encouragement and assistance from his co-defendant Lucas Denney, acquired protective gear and weapons, recruited comrades in arms, and arrived in Washington, D.C. eager for violence. On January 6, as police officers attempted to hold back rioters from breaching the Capitol, Hazard engaged with them, grabbing an officer, pulling him down a set of concrete steps, and falling on top of another officer. One of those officers sustained extensive, significant, and long-lasting injuries. Hazard continued to confront officers on the west side of the Capitol, yelling at them and spraying a

chemical substance at them. He then entered the Capitol building, proclaiming that he was "storming" the Capitol. In the days that followed, Hazard erased the videos and pictures that he had taken on January 6, and bragged about his participation in the riot. Like Mellis, Denny pleaded guilty to violating 18 U.S.C. § 111(a) and (b). Hazard had three prior convictions, two for misdemeanor assaults that generated no criminal history points and one criminal history point for a DUI conviction. This Court sentenced Hazard to 57 months' incarceration.

In *United States v. Ponder*, 21-cr-259 (TSC), the defendant assaulted several police officers on the West Plaza after breaking through the bike rack barricade. Similarly, to Mellis, Ponder swung a flagpole at an officer –with enough force to break the pole in half.   After breaking his first pole, Ponder secured a second, sturdier flagpole, which he used to attack two additional officers. Ponder's case was like Mellis' in that Ponder struck an officer with a pole (similar to Mellis' long, gnarled stick). However, most of Ponder's blows were blocked by police riot shields, with a single blow striking officer J.C. in the left shoulder. Mellis' conduct was more egregious, striking and wounding two officers in the neck and face after he had encouraged another rioter to knock the officers' protective face masks off. Unlike Mellis, Ponder had an extraordinarily difficult childhood and continues to suffer as an adult from addiction and mental health issues. ECF No. 54 at 26.   Mellis, by contrast, did not have a challenging childhood, which he described as "typical middle-class." PSR ¶ 71. Ponder had a prior federal conviction for bank robbery, and a criminal history category of III.   However, unlike Mellis, Ponder accepted responsibility early; he was only the fourth January 6 defendant to plead guilty to violating Section 111(b).   Judge Chutkan sentenced him to 63 months.   A similar sentence is appropriate here.

Additionally, in a related case, *United States v. Mason Courson*, 21-cr-35-RC. Courson

joined the assault on Officer B.M., striking him with a police baton, then, as the officer attempted to stand up and rejoin the police line, pushing him towards the mob of rioters. Courson then grabbed at Officer A.W. as he was still lying on the ground. As officers expelled rioters, Courson grabbed at their equipment. For Courson, the Court calculated a total offense level of 26 and a criminal history category of II, resulting in a Guideline range of 78 to 87 months' imprisonment. This Court imposed a below-guidelines sentence of 57 months' incarceration.

## VI.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[7] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The primary victims in this case, Officers D.P. and L.M., did not suffer significant bodily injury for which they sought medical

---

[7] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

treatment. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Mellis must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Mellis played in the riot on January 6.[8] As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 2022. *Id*. Mellis' restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ECF # 59 ¶ 120.

## G.    Fine

Mellis' conviction subjects him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b)(3). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); U.S.S.G. § 5E1.2(d). In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

The PSR found that Mellis has the ability to pay a fine.   PSR ¶ 97.   He failed to provide Probation with financial disclosures.   *Id.* ¶ 92. Mellis has raised over $88,000 on GiveSendGo. While he has retained counsel, his fundraiser states, "our donations will be put toward getting through trial."   Mellis, however, pled guilty, and thus did not need to put his funds to that use.

---

[8] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

The Court should impose a within-Guidelines fine in the amount of the fundraiser (at last review, $88,464) unless Mellis can substantiate that the funds were used for legal fees.

## CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 60 months, which the government respectfully avers is an appropriate sentence given Mellis' violent assaults on the officers as outline *supra.*, restitution of $2,000, three years of supervised release, a fine of $88,464, and the mandatory $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:      */s/ Emory V. Cole*
Emory V. Cole
PA. Bar #49136
Assistant United States Attorney
United States Attorney's Office for D.C.
601 D Street, N.W.
Washington, D.C. 20530
E-mail:
Emory.Cole@usdoj.gov
Telephone: (202) 252-7692