**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **v.** ) | **Criminal No. 1:21-cr-206-RDM** |
| ) | |
| **JONATHAN MELLIS,** ) | |
| ) | |
| *Defendant.* ) | |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

**I.     INTRODUCTION**

Jonathan Mellis, by and through undersigned counsel, respectfully files this Memorandum in Aid of Sentencing. Mr. Mellis comes before this Court humbled, contrite, and extraordinarily remorseful for his actions which have brought him before it following his acceptance of responsibility upon entering a plea of guilty to one (1) count of Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. §§ 111(a)(l) and (b).

Based upon his personal history and characteristics, the nature and circumstances of the offense, and the need to avoid unwarranted sentencing disparities, Mr. Mellis respectfully requests that the Court impose a sentence of time served, as such a sentence would be "sufficient, but not greater than necessary," to achieve the legitimate purposes of sentencing.18 U.S.C. § 3553(a).

**II.     MR. MELLIS'S BACKGROUND**

Mr. Mellis grew up in a "typical middle-class" family in Freehold, New Jersey, and lived there with his family until he was ten (10) years old. *See* PSR at ¶ 69, 73. His family then relocated to Williamsburg, Virginia;  in 2017 he moved to Nashville, Tennessee. *Id*. at ¶ 73. Mr. Mellis maintains a close relationship with his mother, who is seventy-three (73) years old and a retired nurse, and all five (5) of his siblings. *Id*. at ¶ 69 – 70. Although he has never been married, he does

1

have a fourteen (14) year old son who he maintained contact with every few months prior to his incarceration. *Id*. at ¶ 72.

Mr. Mellis earned in General Equivalency Diploma ("GED") in 2006 and attended some college courses at both Old Dominion University and Ashworth College. *Id*. at ¶ 82. He also has his bartending school certificate and worked in multiple positions in the restaurant industry including as a bartender, server, and barback. *Id*. at ¶ 84 – 88. Mr. Mellis serves his community by giving back and volunteering his time to various charities, including the Lebanon Senior Citizen Center, Youth Special Olympics, and Meals on Wheels. *Id*. at ¶ 89. Being incarcerated has not stopped him in these endeavors. While being held on the instant offense Mr. Mellis organized the raising of funds to benefit the children of incarcerated individuals at the D.C. Jail for the Christmas holidays. *Id*. at ¶ 90.

## III.     THE LEGAL FRAMEWORK OF AN ADVISORY GUIDELINE RANGE

While this Court must still correctly calculate the guideline range, *see Gall v. United States*, 552 U.S. 38, 49 (2007), it may not treat that range as mandatory or presumptive, *see id.* at 51; *see also Nelson v. United States*, 555 U.S. 350, 352 (2009), but as "one factor among several" to be considered in imposing an appropriate sentence under § 3553(a). *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). The Court must "consider all of the § 3553(a) factors," *Gall*, 552 U.S. at 49-50, "make an individualized assessment based on the facts presented," *id.*, and explain how the facts relate to the purposes of sentencing. *See id.* at 53-60; *see also Pepper v. United States*, 131 S. Ct. 1229, 1242-43 (2011). The Court's "overarching" duty is to "'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Kimbrough*, 552 U.S. at 101; *Pepper*, 131 S. Ct. at 1242-43.

In order to ensure that the guidelines are truly advisory and constitutional, this Court has the authority to disagree with a guideline as a matter of policy. Because "the Guidelines are now advisory . . ., as a general matter, courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough*, 552 U.S. at 101-02 (internal punctuation omitted) (*citing Rita v. United States*, 551 U.S. 338, 351 (2007) (holding that district courts may find that the "Guidelines sentence itself fails properly to reflect § 3553(a) considerations").

Additionally, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). Permitting sentencing courts to consider the widest possible breadth of information about a defendant "ensures that the punishment will suit not merely the offense but the individual defendant." *Pepper*, 131 S. Ct. at 1240 (citing *Wasman v. United States*, 468 U. S. 559, 564 (1984)).

In this regard, "the district court's job is not [even] to impose a reasonable sentence. Rather, a district court's mandate is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2)." *United States v. Foreman*, 436 F.3d 638, 644, n.1 (6th Cir. 2006). Accordingly, "if a district court were explicitly to conclude that two sentences equally served the statutory purpose of § 3553, it could not, consistent with the parsimony clause, impose the higher." *United States v. Ministro-Tapia*, 470 F.3d 137 (2d Cir. 2006).

## IV.   THE APPLICABLE UNITED STATES SENTENCING GUIDELINES RANGE

According to the PSR in this matter, the following United States Sentencing Guidelines "U.S.S.G.") sections apply:

**2021 Guidelines**

| | |
|---|---|
| U.S.S.G. § 2A2.2(a) – Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) – Dangerous Weapon | +4 |
| U.S.S.G. § 2A2.2(b)(7) – Convicted under Section 111(b) | +2 |
| U.S.S.G. § 3A1.2(b) – Official Victim | +6 |
| **Adjusted Offense Level (Subtotal)** | **26** |
| U.S.S.G. § 3E1.1(a) – Acceptance of Responsibility | -2 |
| U.S.S.G. § 3E1.1(b) – Acceptance of Responsibility | -1 |
| **Total Offense Level** | **23** |

*See* PSR at ¶¶ 34-46.

Mr. Mellis has a criminal history score of three (3); he, therefore, has a Criminal History Category of II for sentencing purposes. *See* PSR at ¶ 99, 101. Mr. Mellis's Total Offense Level of twenty-three (23) combined with a Criminal History Category of II yields an advisory Guidelines range of fifty-one (51) to sixty-three (63) months. *Id.*

## V.   18 U.S.C. § 3553(a) FACTORS

As the Court is well aware, the Sentencing Guidelines are not mandatory, and while the Court must consult the Guidelines and take them into account at sentencing, *see United States v. Booker*, 125 S. Ct. 738, 767 (2005), Section 3553(a)(1) provides a "broad command to consider 'the nature and circumstances of the offense and the history and characteristics of the defendant.'" *Gall*, 552 U.S. at 50 n. 6. The command is consistent with the Supreme Court's observation that

"the punishment should fit the offender and not merely the crime." *Pepper*, 131 S. Ct. at 1240 (citing *Williams v. New York*, 337 U.S. 241, 247 (1949)). It is similarly consistent with Congress' express directive that "[n]o limitation shall be placed on the information" a sentencing court may consider "concerning the [defendant's] background, character, and conduct." *Id.* (citing 18 U.S.C. § 3661).

### A.     The Nature and Circumstances of the Offense

Mr. Mellis' involvement in the instant offense is extraordinarily regrettable. As he humbly writes to the Court, "I want to take full responsibility for striking two MPD officers with a wooden stick on the lower west terrace." *See* Exhibit A. He continues "I apologize not only to the officers I assaulted, but to every single responding officer on January 6." *Id*. Mr. Mellis knows what he did was wrong and is ready to face the consequences of his actions. *Id*. Nevertheless, the context of Mr. Mellis' conduct is important for the Court to consider in this case, namely that his location and conduct occurred where Rosanne Boyland perished. He tells the Court that he "witnessed Rosanne [Boyland] lose her life … and that haunts [him] every day and night" wishing he did more to help save her. *Id*.

Mr. Mellis describes his time incarcerated as a time filled with "reflection, service, and loss." *Id*. In his letter, he reflects on the events of January 6 and the divisions in our country that led to so much strife and chaos; he talks about how he serves his community by fundraising for inmates; but most powerfully, he opens up about the significant and tragic losses he endured. *Id*. For example, Mr. Mellis' father, a retired Major in the Armed Forces and decorated Vietnam War hero, passed away in May, 2021. *Id*. Mr. Mellis' father was his "best friend and because of [his] actions on January 6, [he] was unable to attend his funeral." *Id*. The loss does not stop there unfortunately. Mr. Mellis also recently lost the love of his life "due to the extended nature of [his]

incarceration." *Id*. He describes her as "the greatest woman I have ever known," and will always regret leaving her "stranded in the world alone with no way to protect and care for her as a man should." *Id*.

Once released, Mr. Mellis plans to reintegrate into society in an active and positive way because as he writes, his "highest priority in life [is] to be of service to others." *Id*. He is positive in his ability to "bridge our political divides" and help unify our country. *Id*. Mr. Mellis knows he has a lot to answer for and apologizes to the Court for any "chaos or confusion" to which he contributed. *Id*. He prays this Court finds it in the interests of justice to have mercy on him. *Id*.

### B.      Mr. Mellis's Personal History and Characteristics

Donna Mellis, Mr. Mellis' mother, writes a heartfelt letter to the Court that provides a glimpse into who her son is – a free spirit who has always been a "caring and supportive" man. *See* Exhibit B. She tells stories of how she and her late husband, Mr. Mellis, "have always been dedicated to the honor of our great nation." *Id*. In fact, Mr. Mellis' father was a retired Major in the U.S. Army, and a recipient of the Silver Star, the Bronze Star, and several Purple Hearts. *Id*. She bears the trauma of manner in which the FBI raided their home to arrest Mr. Mellis and explains that she and her husband had "rifles" with "laser targets pointed at our chests." *Id*. She is saddened by the fact that Mr. Mellis was not granted bond in this case and was never able to say goodbye to his father, whom she describes as Mr. Mellis' "best friend," before his passing. *Id*. The pain jumps off the pages in her letter. *Id*.

Mitchell White, a seventy-one (71) retired writer and friend, tells the Court how "impressed" and "intrigued" he was with Mr. Mellis from the first time he met him. *See* Exhibit C. He remembers Mr. Mellis acknowledging the mistakes of the past, and also how Mr. Mellis was very "idealistic, adventurous, and still searching for his role" in his community and society at

large. *Id*. Mr. White has been in contact with Mr. Mellis continuously throughout his incarceration and is always "surprised" by Mr. Mellis' "ability to remain positive and upbeat," even in the face of such adversity. *Id*. Over time, Mr. White has come to know Mr. Mellis as a "man of great loyalty and kindness," and "someone who is not just well-intentioned, but active in his drive to help others." *Id*. He recalls many conversations that affirm his belief that Mr. Mellis' behavior on January 6 was an aberration, and that Mr. Mellis "abhors violence" and has tremendous "respect for police and authority." *Id*. He is confident that Mr. Mellis has matured throughout his incarceration, and that "he will be an asset and blessing to the neighborhood and community." *Id*. In asking the Court to take these considerations into account, he explains that Mr. Mellis is a man "with a big heart and a deep drive to be a good person." *Id*.

Evan Harris, who has known Mr. Mellis for over twenty (20) years, considers Mr. Mellis a "brother," and has worked, travelled, and "spent many a night talking" with him. *See* Exhibit D. He considers Mr. Mellis a "good man with a good heart." *Id*. He tells the Court how proud he was of Mr. Mellis when he was last released from prison because Mr. Mellis immediately became a "productive member of society" who was "always smiling" and made "everybody he talked to laugh." *Id*. He remembers Mr. Mellis volunteering his time not only to charities, but his random acts of kindness, like helping Mr. Harris clean out his mother's house over four (4) days. *Id*. He acknowledges that Mr. Mellis' conduct on January 6 was "horrible," but he truly believes that Mr. Mellis "regrets" his actions and "learned his lesson." *Id*. Mr. Harris' confidence in Mr. Mellis is so strong that he tells the Court that Mr. Mellis will have a room waiting for him at Mr. Harris' house and a job at his company upon release. *Id*.

It is clear that Mr. Mellis is beloved by his family and friends. All who are close to him believe in his goodness, and that this lapse of judgment is not indicative of who Mr. Mellis is at

his core. Further, everyone is confident that he will never again be before the Court, and they cannot wait for his return.

### C.   Mr. Mellis's Poses Little Risk of Recidivism

Of all the purposes of sentencing, the need to protect the public from further crimes of the defendant is one of great practical concern and is the most capable of being measured. Mr. Mellis is thirty-seven (37) years old and his character, deep remorse, and courage to hold himself accountable ensure he will never again commit any such transgression. And because of the reinvigorated role of the judiciary in sentencing, judges can now impose sentences that take research into consideration to more effectively impose sufficient, but not greater than necessary, sentences.

The judiciary's bolstered role is especially important given the Sentencing Commission's own findings that "there is no correlation between recidivism and Guidelines' offense level. Whether an offender has a low or high guideline offense level, recidivism rates are similar. While surprising at first glance, this finding should be expected, as the Guidelines' offense level has long been recognized as not intended or designed to predict recidivism." *U.S. Sentencing Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 15 (May 2004) (hereinafter *Measuring Recidivism*). Thus, the guidelines are at odds with 18 U.S.C. § 3553(a)(2)(C). Accordingly, *United States v. Booker*, 543 U.S. 220 (2005), has freed the judiciary to remedy this inconsistency.

Mr. Mellis does not make excuses or attempts to minimize his behavior, and relies on his commitment to bettering himself and the support of his family to move forward. Despite his past criminal history, Mr. Mellis does not fit the archetype of a person who will commit new criminal offenses or recidivate, especially because of the unique circumstances surrounding the January 6

events. He has matured significantly throughout his time of incarceration and his only desire is to remain a productive member of society upon release.

### D. The Need to Avoid Unwarranted Sentencing Disparities

An additional and crucial factor to consider is the "need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Despite its best efforts, the government has been largely inconsistent with its plea offers and sentencing recommendations for similarly situated January 6 defendants. It is Mr. Mellis' position that sentences should not vary drastically simply because of the discrepancy in plea offers. This is especially the case where the offense conduct was much more egregious than Mr. Mellis' and the defendant was allowed to plead to only 18 U.S.C. § 111(a). This is significant because of the two-level guideline enhancement that automatically applies with a plea to 18 U.S.C. § 111(b). Accordingly, treatment of similarly situated defendants supports Mr. Mellis' request for the Court to impose a sentence of time served.

### *Unwarranted Disparities in Plea Offers*

There is a clear and unwarranted discrepancy in plea offers, and in a number of instances, defendants were allowed to plead under Section 111(a) only, thereby reducing their sentencing guideline calculation by two (2) points automatically because of the enhancement that applies with pleading to Section 111(a) and (b). Mr. Mellis' request for time served is appropriate in light of cases where the facts are on par with or more egregious than those in Mr. Mellis' case and who received the benefit of only pleading to Section 111(a).

For example, in *United States v. Richardson*, the defendant pleaded to one (1) count of Section 111(a) for his conduct on January 6, 2021, which included bringing a long, metal flagpole and using it to strike an officer three (3) times (only stopping after it broke on the third hit) and

using an enormous metal Trump sign as a battering ram against officers. *See* No. 1:21-cr-721-CKK. During his change of plea hearing, Mr. Richardson made false representations to the Court. *Id.* Additionally, while he awaited sentencing, Mr. Richardson was arrested for aggravated assault and lied to the local police about his conduct. *Id.* Despite his reprehensible conduct in the aftermath of January 6 and the fact that he was on bail for Illegal Possession of a Firearm, Mr. Richardson was ultimately sentenced to forty-six (46) months' imprisonment, the government's recommendation. *Id.*

Another example is Ricky Willden's case. Mr. Willden, a member of the Proud Boys, was sentenced to twenty-seven (27) months following the entry of his guilty plea to one (1) count of a violation of Section 111(a). *See United States v. Willden*, No. 1:21-cr-423-RC. On January 6, 2021, Mr. Willden, who was wearing goggles that he brought with him, assaulted numerous officers with a chemical irritant, subsequently threw the emptied canister at officers, and entered the Capitol. *Id.* Following the day's events, Mr. Willden deleted messages and videos from Facebook. *Id.* Despite his conduct, Mr. Willden was not required to plea to the more serious offense Section 111(a) and (b) and did not receive the dangerous weapon enhancement. *Id.*

Landon Copeland pushed another rioter into one officer, who fell and sustained injuries to his knee, back, and hip. *See United States v. Landon Copeland*, 21-cr-570-APM. He grabbed a riot shield of one officer and pushed back against the police line and grappled with another officer while blocking other officers attempting to render aid to the injured officer. *Id*. Further, he helped others grab a barricade bike rack and threw it into multiple officers. *Id*. Mr. Copeland received the benefit of pleading only to a violation of Section 111(a) and the government requested a fifty-two (52) month sentence – the Court imposed a thirty-six (36) month sentence.

### Mr. Mellis' Conduct On January 6, 2021

Mr. Mellis' conduct included posting inflammatory statements and videos to social media about the day's events, but when looking at the violent conduct, it is clear that his conduct is either on par or less egregious than the previously cited examples or the examples included below. According to the statement of facts in this case, Mr. Mellis "used a large wooden stick, to repeatedly strike or stab at Officers D.P. and L.M." *See* Dkt. No. 51. He did so "in the face, head, neck, and body area." *Id*. There is no evidence that Mr. Mellis' conduct specifically resulted in the injuries to either officer, and the entirety of the assaultive conduct took place over a period of approximately ten (10) seconds. It is important to note that Mr. Mellis did not bring the stick with him that day; someone on the scene handed it to him.

### This Court's Comparable Sentences

This Court is well versed in the now eighty (80) plus page sentencing comparison chart of all January 6 defendants.[1] For sake of brevity and to focus the Court's attention, Mr. Mellis asks the Court to consider the following cases in which this Court already imposed sentences. Each contains important facts that distinguish Mr. Mellis' conduct and support a sentence of time served.

In *United States v. Alan Byerly*, the defendant pleaded guilty to violations of 18 U.S.C. §§ 111(a) and 113(a)(4). Mr. Byerly purchased a stun gun that was capable of emitting electronic shock to a victim and had it in his possession during the events on January 6, 2021. *See* 21-cr-527, Dkt. No. 44. He engaged in multiple altercations that day, including pushing, shoving, and dragging a reporter. *Id*. He later then showcased his stun gun towards officers by activating the electrical charge, which caused officers to react. *Id*. After a struggle, the officers were able to retrieve the stun gun from him, and Mr. Byerly fled the area with the assistance of another rioter

---

[1] Available at https://www.justice.gov/usao-dc/capitol-breachcases.

only after continuing to strike and push against the officers and reaching for another officer's baton. *Id*. Mr. Byerly was a Criminal History Category I and the government requested a sentence of forty-six (46) months – the Court ultimately imposed a sentence of thirty-four (34) months.

In *United States v. Matthew Miller*, the defendant pleaded guilty to violations of 18 U.S.C. § 111(a) and 18 U.S.C. § 1512(c)(2). *See* 21-cr-75, Dkt. No. 58-59.  At various times, Mr. Miller threw objects at the U.S. Capitol building, and used the metal barriers as a makeshift ladder to scale the walls. *Id*. He further attempted to lead the crowd in penetrating the Lower West Terrace tunnel, and at a later point used a fire extinguisher to spray directly into the tunnel where law enforcement officers were defending the entrance to the U.S. Capitol. Mr. Miller was a Criminal History Category I, and the government requested a fifty-one (51) month sentence – the Court ultimately imposed a thirty-three (33) month sentence.

In *United States v. Lucas Denney*, the defendant pleaded guilty to one count of 18 U.S.C. §111(b). *See* 21-cr-70. According to the Joint Statement of Facts, the defendant engaged in significant planning prior to the events of January 6, 2021, and he was the self-declared president of a militia group called the Patriot Boys of North Texas. *Id*. at Dkt. 60-1. He engaged in discussions with other individuals about recruiting and their plans to defend the country against ANTIFA and BLM, joining up with Proud Boys and other militias. *Id*. On January 6, Mr. Denney engaged in violent behavior on multiple occasions. *Id*. He pulled metal barriers away from officers, tried to grab batons away from officers, swung a PVP pipe at an officer, missed, and hit a photojournalist, and pushed riot shields onto officers in the tunnel at the Lower West Terrace. *Id*. Following January 6, Mr. Denney was untruthful to law enforcement during an interview about his conduct on that day. *Id*. It is unclear what Mr. Denney's advisory guideline range was, but the

government requested a sentence in the middle thereof, and the Court ultimately imposed a fifty-two (52) month sentence.

In *United States v. Jamie Buteau*, the defendant pleaded guilty to a violation of 18 U.S.C. §111(a). *See* 21-cr-489, at Dkt. 52, 54. Mr. Buteau actually entered the Capitol building with his wife and stayed inside for sixteen (16) minutes. He observed much of the chaos that was ensuing and engaged with officers near the Capitol Visitors Center. *Id*. He then picked up and threw a chair at an officer, whereby the chair bounced off the wall and hit an officer on the arm. Mr. Buteau had a Criminal History Category of I, and the government requested a forty-two (42) month sentence – the Court ultimately imposed a twenty-two (22) month sentence. *Id*.

In *United States v. Michael Lockwood*, the defendant pleaded guilty to one count of 18 U.S.C § 111(a). *See* 23-cr-146, Dkt. No. 31-32. Mr. Lockwood engaged heavily on social media about the events of January 6, both during and after the events. *Id*. In terms of his assaultive conduct, Mr. Lockwood jumped off of a raised platform and grabbed a baton away from an officer attempting to subdue another rioter who was swinging a flagpole at him. *Id*.  He then later bragged about getting into a fight with an officer and obtaining a souvenir from the day's events. *Id*. Mr. Lockwood had a Criminal History Category of I, and the government requested a twenty-seven (27) month sentence – the Court ultimately imposed a twelve (12) month sentence.

**Mr. Mellis's Public Demise is Adequate Deterrence to Others**

Section 3553(a)(2)(B) requires the Court to consider "the need for the sentence imposed to afford adequate deterrence to criminal conduct." Arguably, the government has already substantially achieved the maximal deterrent effect of Mr. Mellis' offense simply by charging and convicting him. As a result, Mr. Mellis' name and the substance of his offense will be discussed in numerous conversations and settings among family, friends, and the community for years to

come, a disheartening reality from which he simply cannot escape. In short, Mr. Mellis' public

demise sends a strong message to anyone foolish enough to engage in similar offenses.

**VI.     CONCLUSION**

In light of the above, Mr. Mellis respectfully requests that the Court impose a sentence of

time served.

Respectfully submitted,

_____/s/_____
David Benowitz
D.C. Bar No. 451557
Rammy G. Barbari
D.C. Bar No. 1032106
Price Benowitz, LLP
409 7th Street, NW, Suite 200
Washington, D.C. 20004
(202) 417-6000
David@PriceBenowitz.com
Rammy@pricebenowitz.com

*Counsel for Jonathan Mellis*

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on this 14th day of December 2023, I caused a true and correct copy of the foregoing Defendant's Memorandum In Aid of Sentencing to be delivered via CM/ECF to all parties in this matter.

_____/s/_____
David Benowitz
Rammy G. Barbari